Original

Approved: _____
PAUL MONTELEONI/ALINE FLODR/THOMAS McKAY
Assistant United States Attorneys

Before:  HONORABLE KATHARINE H. PARKER
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - x
:            **20 MAG 12902**
UNITED STATES OF AMERICA      :     <u>**SEALED COMPLAINT**</u>
:
- v. -                        :     Violations of
:     18 U.S.C. §§ 666 and 2
MICHAEL GUNDERSEN,            :
:     COUNTIES OF OFFENSE:
Defendant.         :     NEW YORK
:
- - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

MATTHEW BRIGHAM, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

<u>**COUNT ONE**</u>
**(Federal Program Fraud)**

1.   From at least in or about January 2018, up to and including in or about May 2019, in the Southern District of New York and elsewhere, MICHAEL GUNDERSEN, the defendant, being an agent of an organization, State and local government and an agency thereof, to wit, an employee of the New York City Transit Authority ( "NYC Transit"), an affiliate of the Metropolitan Transportation Authority ("MTA"), knowingly did embezzle, steal, obtain by fraud, and otherwise without authority knowingly did convert to the use of a person other than the rightful owner, property that is valued at $5,000 and more and is owned by and is under the care, custody, and control of such organization, government, and agency, while such government and agency was in receipt of, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of federal assistance, to wit, GUNDERSEN made false time reports, which fraudulently overstated the number of hours that he had worked, and thereby

received over $5,000 dollars in payments for hours that he did not in fact work.

(Title 18, United States Code, Sections 666(a)(1)(A) and 2.)

The bases for my knowledge and for the foregoing charge are, in part, as follows:

2.   I am a Special Agent with the FBI and I have been personally involved in the investigation of this matter, which has been jointly investigated with the MTA's Office of the Inspector General ("MTA-OIG").  This affidavit is based upon my personal participation in the investigation of this matter, my conversations with law enforcement agents, witnesses, and others, as well as my examination of reports, records, and audio recordings.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**Overview**

3.   This charge arises from a scheme carried out by MICHAEL GUNDERSEN, the defendant, whereby GUNDERSEN fraudulently received tens of thousands of dollars in compensation by falsely claiming to have worked overtime hours that in fact he did not.  As set forth in detail below, GUNDERSEN frequently claimed to have been working regular and overtime shifts at times when he was in fact on vacation or attending dinners, concerts, or other events with friends and family.  In the course of this scheme, GUNDERSEN claimed to have worked at least hundreds of hours that he did not, and was paid at least tens of thousands of dollars and likely more for such fraudulent claims.

4.   The MTA is a public benefit corporation responsible for public transportation in New York State.  The MTA runs North America's largest transportation network, providing bus, subway and rail service to a population of more than 15 million people in New York City and the surrounding area.  The MTA's operating agencies include NYC Transit (also known as MTA New York City Transit), which operates New York City subways and buses.

5.   MICHAEL GUNDERSEN, the defendant, is an employee of NYC Transit.  Since in or about 2015, GUNDERSEN has been a

Maintenance Supervisor Level II, which requires him to, among other things, provide managerial-level oversight and support of Third Rail Contract Compliance and Circuit Breakers.  Such duties are not readily susceptible to working from home or other remote locations.

      6.    Based on publicly available sources, as well as my conversations with representatives of the MTA-OIG, I know that in each year relevant to this complaint, the MTA and NYC Transit each received funds from the federal government in excess of $10,000.

### GUNDERSEN's Excessive Overtime Claims

      7.    Based on my review of MTA records and conversations with MTA-OIG auditors, I have learned the following:

      a.    At all relevant times, MICHAEL GUNDERSEN, the defendant, received an hourly rate for his regular 40-hour weekly schedule, and was then entitled to be paid higher "overtime" rates for any additional hours worked.

      b.    At all relevant times, GUNDERSEN was required to self-report his time, including any overtime hours.  He did this by submitting an NYC Transit form called a "sign on and off sheet" to a timekeeper or by communicating his hours to the timekeeper by email or other means.

      c.    In 2018, GUNDERSEN was paid approximately $385,000 by the MTA. Of that amount, approximately $102,000 comprised his base salary and other forms of compensation apart from overtime, while the additional approximately $283,000 was paid for voluntary overtime shifts.  In total this made GUNDERSEN one of the five highest paid employees in the MTA during 2018 -- higher than, for example, the Chairman of the MTA.

      d.    In 2018, GUNDERSEN claimed to have worked approximately 3,914 overtime hours, on top of 1,880 regular hours.  That is, if GUNDERSEN had worked every single day in 2018 including weekends and holidays (although he did not), that would average out to over 10 hours of overtime *every day* for an entire year in addition to his normal, 40-hour work week.

      e.    In the first few months of 2019, GUNDERSEN continued to claim a very large number of overtime hours, reporting that he worked approximately 1,004 overtime hours just in the period from January through April 2019.

8.     In or about late April 2019, several media organizations published reports on the extremely large amounts of overtime pay received by some of the MTA's employees during 2018. Shortly thereafter, in or about May 2019, several media organizations published reports indicating that federal investigators were probing these overtime payments.  Based on my interview of an NYC Transit supervisor, I have learned that, in or about this time period, NYC Transit took steps to control the amount of overtime that would be authorized for employees.  Based on my review of MTA records and conversations with MTA-OIG auditors, I have also learned that, at or around the time of these reports and actions, the overtime hours claimed by MICHAEL GUNDERSEN, the defendant, began to decline.

### GUNDERSEN's Absence from Work

9.     As set forth below, a detailed review of the hours MICHAEL GUNDERSEN, the defendant, claimed to have worked reflects that he was frequently absent from work at times that he claimed to be working.  Based on my conversations with multiple individuals who supervised GUNDERSEN, I have learned that his regular job duties required him to be at or in the immediate vicinity of the job site and could not be performed from remote locations such as his home.

10.    In performing this investigation, MTA-OIG auditors have worked with criminal investigators to perform a detailed review of the hours claimed to be worked by MICHAEL GUNDERSEN, the defendant.  This review compared GUNDERSEN's time records with various records that establish GUNDERSEN's true whereabouts, such as his work and personal emails, cell site location information and other records related to his cellular phone, and Facebook records.  Based on that comparison for 2018 and 2019, the investigation has identified at least hundreds of hours when GUNDERSEN was not at work when he claimed to have been (and thus was required to be), resulting in at least tens of thousands of dollars  in payments for hours that GUNDERSEN did not in fact work.[1]

---

[1] These estimates are approximate and likely conservative figures, as they are limited to the instances in which data from these sources affirmatively contradicted the hours reflected in GUNDERSEN's claimed time reports. In light of the implausibly high amount of overtime claimed by GUNDERSEN, the true totals are likely substantially higher.

11.   In particular, based on my review of time reports submitted by MICHAEL GUNDERSEN, the defendant, MTA building access card data,[2] Metrocard data, emails sent and received by GUNDERSEN from his work and personal accounts, cell site location information and other telephone records, bank records, and Facebook records, among other records, I have learned the following:

*March 23-25, 2018*

   a.   Subsequent to the respective shifts, GUNDERSEN reported that he had worked from 6:00 a.m. on March 23, 2018 to 12:00 a.m. on March 24, and from 5:00 a.m. on March 24 to 12:00 a.m. on March 25.  He was paid for 37 hours for that period, for a total of approximately $2,481.  GUNDERSEN did not use any vacation time for this period, instead claiming in his time reports to be at work.  In fact, I believe that for much of those time periods, GUNDERSON was in Atlantic City, New Jersey -- a location in which NYC Transit, which is based in New York, has no offices or regular business -- because, among other reasons:

      i.   On or about March 15, 2018, GUNDERSEN received an email confirming that he had tickets to a concert in Atlantic City at 8:00 p.m. on March 23, 2018, or in the middle of the first scheduled shift.

      ii.   On or about March 20, 2018, GUNDERSEN received an email containing tickets to a second concert in Atlantic City on March 24, 2018 at 10:00 p.m., or during the second scheduled shift.

      iii.   On or about March 15 and 20, 2018, GUNDERSEN received emails confirming his reservations for two adults to stay in two different hotels in Atlantic City -- one on the night of March 23 and one on the night of March 24, 2018.

      iv.   GUNDERSEN's access card last entered his office at NYC Transit at approximately 1:49 p.m. on March 23,

---

[2] GUNDERSEN's access card data shows times that he *entered* his office building, but typically does not show when he exited.  Based on my conversations with MTA-OIG personnel, I believe this is because his office building does not require an access card swipe in order to exit.

2018, and did not swipe back into his office until approximately 6:53 p.m. on March 25, 2018.

   v. GUNDERSEN's telephone records reflect that he engaged in two calls on March 24, 2018 and three calls on the morning of March 25, 2018 all from the vicinity of Atlantic City, New Jersey.  They also reflect a call at 2:50 p.m. on March 25, 2018 from Bayonne, New Jersey.

   vi. Automated license plate reader records reflect that a vehicle registered to GUNDERSEN passed through the Holland Tunnel -- a tunnel connecting New York City and New Jersey -- traveling toward New York City at approximately 3:00 p.m. on March 25, 2018.

*April 2, 3 & 7-8, 2018*

  b. Subsequent to the respective shifts, GUNDERSEN reported having worked from 8:00 a.m. to 4:00 p.m. on April 2, 2018; from 8:00 a.m. to 4:00 p.m. on April 3; and from 5:00 a.m. on April 7 to 12:00 a.m. on April 8.  He was paid for 35 hours for these claimed shifts, for a total of $2,145.  GUNDERSEN did not use any vacation time for these claimed shifts, instead claiming in his time reports to be at work.[3]  In fact, I believe that GUNDERSEN was on vacation in Williamsburg, Virginia from April 2 to April 7, 2018 because, among other things:

   i. On or about February 27, 2018, GUNDERSEN received an email confirming his reservation for four guests at a resort in Williamsburg, Virginia from Monday, April 2, 2018 to Saturday, April 7, 2018.

   ii. On or about Friday, April 6, 2018, GUNDERSEN sent an email from his work account, in which he referred to a delivery that had come "on Tuesday afternoon [*i.e.*, April 3, 2018] *after I left for vacation*" (emphasis added).  Later the same day, in response to an email asking whether he could meet someone in New York at 2:00 p.m. on Saturday, April 7, 2018, GUNDERSEN sent an email, stating: "I am leaving VA tomorrow morning so depending on traffic I might not make it by 2."

---

[3] GUNDERSEN did use vacation time for April 4-6, 2018 -- i.e., for a portion of this vacation to Williamsburg.  This portion is not considered to be an unexcused absence.

6

        iii.    GUNDERSEN's access card swiped into his office on March 29, 2018 at approximately 7:36 a.m., but did not swipe in again until April 8 at approximately 12:50 p.m.

        iv.    GUNDERSEN's telephone records reflect that he engaged in two calls from the vicinity of Englishtown, New Jersey at 11:27 and 11:32 a.m. on April 2, 2018 -- *i.e.*, over 4 hours before the end of his 8:00 a.m. to 4:00 p.m. shift on that day. GUNDERSEN's residence is located in Manalapan Township, New Jersey, which borders on Englishtown and shares the same ZIP code. Manalapan Township is approximately 47 miles away from his office by car, and Englishtown is approximately 45 miles away from his office by car.

        v.    GUNDERSEN's telephone records also reflect that he engaged in a total of 23 calls from the vicinity of Williamsburg, Virginia from 8:37 p.m. on April 2, 2018 through 10:53 a.m. on April 7. Of these calls, three took place during GUNDERSEN's claimed 8:00 a.m. to 4:00 p.m. shift on April 3, and two took place during GUNDERSEN's claimed 5:00 a.m. April 7 to 12:00 a.m. April 8 shift.

        vi.    GUNDERSEN's telephone records also reflect numerous calls evidencing his apparent return from this vacation following his departure on April 7, 2018, during his claimed 5:00 a.m. April 7 to 12:00 a.m. April 8 shift. They reflect calls from locations in Maryland at 2:26 p.m. and in Delaware at 4:13 p.m. -- *i.e.*, over 9 and over 11 hours after the start of his claimed shift. The records also reflect nine calls from the vicinity of Englishtown and Manalapan, New Jersey between 6:33 p.m. and 7:32 p.m. -- *i.e.*, from over 13 to over 14 hours after the start of his claimed shift.

*September 29-30, 2018*

    c.    Subsequent to the respective shifts, GUNDERSEN reported having worked back-to-back overtime shifts from 4:00 a.m. on September 29, 2018 to 12:00 a.m. on September 30, and was paid for 20 hours of overtime during that period, for a total of approximately $1,448. GUNDERSEN did not use any vacation time for this period, instead claiming in his time reports to be at work. In fact, I believe that GUNDERSEN was visiting a farm with his family for much of that period, because:

        i.    On or about November 25, 2018, GUNDERSEN sent himself an email attaching three photographs, with metadata showing the images were taken at 3:05, 3:28 and 3:30 p.m. on

7

September 29, 2018, *i.e.*, in the middle of the overtime shifts described above. The photographs show GUNDERSEN and his family at a farm in Manalapan, New Jersey.

       ii.     Records from Facebook reflect that one of these photographs was posted to GUNDERSEN's wife's Facebook account.

       iii.    GUNDERSEN's access card did not swipe into his office at all on September 29, 2018.

       iv.     GUNDERSEN's telephone records reflect that he engaged in two phone calls from the vicinity of Manalapan, New Jersey -- *i.e.*, the township in which the farm is located -- at 1:09 p.m. and 4:07 p.m. on September 29, 2018, also in the middle of the overtime shifts he claimed to have worked.

*September 30-October 1, 2018*

     d.    Subsequent to the respective shifts, GUNDERSEN reported having worked back-to-back overtime shifts from 5:00 a.m. on September 30, 2018 to 12:00 a.m. on October 1, 2018, and was paid for 19 hours of overtime during that period, for a total of approximately $1,374. GUNDERSEN did not use any vacation time for this period, instead claiming in his time reports to be at work. In fact, I believe that GUNDERSEN was participating in a five-kilometer footrace in New Jersey during at least a portion of those shifts, because, among other reasons:

       i.      On or about September 27, 2018, GUNDERSEN received an email thanking him for donating to a charity 5K race, stating that he was listed as a volunteer, and asking if he also wanted to run in the race. GUNDERSEN replied that he "would love to run in the race" and that he "will be there at 8:30AM," -- *i.e.*, in the middle of the overtime shifts described above -- "to help set up."

       ii.     On or about September 30, 2018, GUNDERSEN received a group email titled "Attention All 5K Volunteers." The email thanked GUNDERSEN and others for volunteering to help with a 5K fundraiser race, asked that volunteers arrive by 8:30 a.m. on Sunday, September 30, 2018, and said that the day would likely end around 11:30 a.m.

       iii.    GUNDERSEN's telephone records reflect that he engaged in six telephone calls from 9:31 a.m. to 3:18 p.m. on September 30, 2018 -- *i.e.*, a six hour period in the middle of

his claimed shift -- from the vicinity of Englishtown and Manalapan, New Jersey.

*December 29, 2018-January 2, 2019*

  e. Subsequent to the respective shifts, GUNDERSEN reported having worked both regular time and overtime on December 29, 2018 through January 2, 2019, and was paid for 24 hours of regular time and 58 hours of overtime during that period, for a total of approximately $5,368. GUNDERSEN did not use any vacation time for this period, instead claiming in his time reports to be at work. In fact, I believe that GUNDERSEN was at a family vacation in the Hudson Valley during that period, because, among other reasons:

  i. On or about November 6, 2018, GUNDERSEN received an email confirming reservations for two adults and three children to stay at a resort in the Hudson Valley, New York, from December 29, 2018 through January 2, 2019.

  ii. GUNDERSEN's access card swiped into his office on December 28, 2018 at approximately 5:58 a.m., but did not swipe in again until January 3, 2019, at approximately 7:38 a.m.

  iii. GUNDERSEN's telephone records reflect that he engaged in two telephone calls at 8:55 a.m. and 10:46 a.m. on December 29, 2018 -- *i.e.*, almost 4 and over 5 hours after the start of GUNDERSEN's claimed shift from 5:00 a.m. on December 29 to 12:00 a.m. on December 30 -- from Englishtown and Old Bridge, New Jersey. As noted above, Englishtown is approximately 45 miles from his Brooklyn office.

  iv. GUNDERSEN's telephone records also reflect that he engaged in a total of 12 calls from the vicinity of Plattekill, New York, a town near the resort described above, on December 29 and 31, 2018 and January 1 and 2, 2019. Of these calls, one took place during GUNDERSEN's claimed shift from 5:00 a.m. on December 29, 2018 to 12:00 a.m. on December 30, four took place during GUNDERSEN's claimed shift from 5:00 a.m. to 10:00 p.m. on December 31, two took place during GUNDERSEN's claimed shift from 8:00 a.m. to 4:00 p.m. on January 1, 2019, and four took place during GUNDERSEN's claimed shift from 5:00 a.m. on January 2 to 12:00 a.m. on January 3.

  v. GUNDERSEN's telephone records also reflect that he engaged in a number of telephone calls during his claimed

shift from 5:00 a.m. on January 2, 2019 to 12:00 a.m. on January 3, apparently after returning from the resort.  In particular, from 1:57 p.m. to 3:48 p.m. on January 2, 2019 -- *i.e.*, during the middle of his claimed shift -- GUNDERSEN engaged in 7 calls from Englishtown and Manalapan, New Jersey, both a considerable distance from his New York office.

WHEREFORE, I respectfully request that an arrest warrant be issued for MICHAEL GUNDERSEN, the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

_____/s/ Matthew Brigham_____
MATTHEW BRIGHAM
Special Agent, FBI

Sworn to before me this
2nd day of December, 2020

_____
THE HONORABLE KATHARINE H. PARKER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK